RADER, Circuit Judge,
dissenting-in-part and concurring-in-part.
This decision casts a large shadow over patent protection by its overly expansive interpretation of the 35 U.S.C. § 271(e)(1) exemption. In particular, this court today expands the exemption beyond the Supreme Court’s limits on the provision to eliminate protection for research tool inventions. The Supreme Court stated “that § 271(e)(l)’s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the [Federal Food, Drug and Cosmetic Act (FDCA) ].” Merck KGaA v. Integra Lifesciences I, Ltd,., 545 U.S. 193, 202, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005). Thus, the exemption covers activities that develop information that will ultimately be submitted to the FDA, not patented processes and tools beyond the scope of the “patented compounds” that the Supreme Court placed within the statutory exemption. In this case, two of the patents are research tools that deserve protection. This court should remand with instructions that the district court examine and protect these research tool patents.
Sadly this court does not even examine the patents ■ at issue in this case. This court, noted for its emphasis on claims as definers of patent scope, ironically does not recite or analyze the claims of these patents in the slightest. Moreover this court speaks in broad terms about the experiments and results without specifying *1349 which patented compound or method was in use in the experiments. A careful examination of the patents shows that two of them have no application at all outside of a laboratory. If the patents in this case are not research tools, then of course this court could quickly construe the claims and show that they claim drugs or other products likely to undergo FDA clearance, not simply laboratory methods. Unfortunately even a cursory analysis of the patents (undertaken in this dissent) shows that two of them have no application outside the laboratory.
Rather than construe the claims, usually the first task in any patent case, this court relies on a letter from one of the parties explaining that it does not wish to rely on the research tool exception. This supposedly authoritative letter appeared after the oral argument before this court in an attempt to rectify counsel’s unresponsive performance. With the patents already expired, Integra may pursue a strategy to protect its entire multi-million-dollar verdict. If Integra had really not wished to rely on research tool patents, then it would not have asserted them in the first place. In any event, because four patents are part of this case, this court has a responsibility to construe their claims. By treating these research tools the same as drugs potentially needing FDA clearance, this court’s opinion poses a danger to the entire research tool industry.
I
After the Supreme Court “extended] ... [the exemption] to all uses of patented inventions that are reasonably related to the [FDA clearance process]”, it explained that its decision “provides a wide berth for the use of patented drugs in activities related to the federal regulatory process.” Id. (emphasis added). The Supreme Court then further explained:
At least where a drugmaker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the FDA, that use is ‘reasonably related’ to the [exemption criteria].
Id. at 207, 125 S.Ct. 2372 (emphases added). In the next few sentences, the Court reiterates repeatedly that its decision affects “a patented compound in experiments that are not themselves included in a ‘submission of information’ ” and “uncertainties” in “selection of a specific drug ” and “the use of patented compounds in preclinical studies.” Id. at 207-208, 125 S.Ct. 2372 (emphases added). Thus, the Supreme Court makes clear that its reading of the exemption applies to the selection and perfection of patented compounds in preclinical studies leading to FDA approval. The Supreme Court is not, however, addressing patented methods or processes — research tools — that measure, analyze, and assess the characteristics of those compounds during experimentation and development.
In other words, the Supreme Court reversed this court’s earlier decision that would not have extended the exemption to embrace early experiments to find a drug candidate. Instead the Supreme Court extended the exemption back up the experimentation chain to include selection of particular species for FDA approval out of a patented genus. The Supreme Court did not, however, extend the exemption to encompass any method or process or other research tool that might be used in a pharmaceutical laboratory.
To drive this point home with more than repetition, the Supreme Court included an important footnote:
We therefore need not — and do not— express a view about whether, or to *1350 what extent, § 271(e)(1) exempts from infringement the use of “research tools” in the development of 'information for the regulatory process.
Id. at 205 n. 7, 125 S.Ct. 2372 (emphasis added). The Supreme Court simply did not intend to even address research tools, let alone, render research tools valueless for their one and only use — to test and ascertain information about candidate compounds.
The exemption’s primary purpose is to permit generic manufacturers to perform research on drugs in the pipeline for FDA approval. According to the House Committee that initiated the provision, the exemption only deals with pre-market activity as “a limited amount of testing so that generic manufacturers can establish the bioequivalency of a generic substitute.” H.R.Rep. No. 857, at 8, reprinted in 1984 U.S.C.C.A.N at 2692. The House Committee noted that the “nature of the interference with the rights of the patent holder” would not be “substantial,” but “de mini-mus.” Id. at 2692, 2714. The Supreme Court extended this statutory exemption to reach as well activities reasonably related to that function. Merck KGaA, 545 U.S. at 202, 125 S.Ct. 2372.
II
Sadly this court’s devastating impact on research tool inventions is not even really evident on the face of the opinion. As noted, this court, celebrated for its attention to patent scope, does not analyze these claims. Even a passing examination of the claims leaves the unmistakable conclusion that two of the patents apply only to laboratory methods without any possibility of submission to the FDÁ. Two of the patents, under any definition, would be research tools.
An analysis of the patents in this ease shows that Merck’s use of the '525 and '997 patents may fall within the exemption as “reasonably related” to the submission of FDA information. On the other hand, the '237 and '734 patents are research tools that deserve protection and bear little, if any, relationship to FDA processes.
Although this court should have remanded to the district court to analyze the patents for their reasonable relationship to FDA submissions, a brief examination of the patents shows the tenuous relationship of the research tools to any FDA processes. The '237 and '784 patents claim methods for specific laboratory experiments, not compounds subject to FDA processes. These inventive methods are pure research tools. For example, the '237 patent claims:
4. A method for detaching animal cells from a substrate to which they are bound in an Arg-Gly-Asp mediated manner, comprising contacting said bound cells with a solution containing non-naturally occurring peptide consisting essentially of the amino acid sequence Arg-Gly-Asp-Y, [wherein Y][sic] is any amino acid such that the peptide has cell-detachment activity.
8. A method for detaching animal cells from a substrate to which they are bound in an Arg-Gly-Asp" mediated manner, comprising contacting said bound cells with a peptide consisting essentially of the amino acid sequence X-Arg-Gly-Asp-Y wherein X is zero to thirty amino acids and Y is one of thirty amino acids, such that the peptide has cell detachment promoting activity.
'287 Patent col. 10 11.62-68, col. 11 1.16-col.12 1.5 (emphases added). The claims of the '237 patent begin: “A method for detaching animal cells from a substrate.” A substrate is a laboratory medium for growing or maintaining organisms, tissues, or cell cultures. In this instance, as the specification explains, the substrate sustains cells that must be attached and detached *1351 for study and testing. In simple terms, this inventive method does not encompass any substances that enter the human body and need FDA clearance. This invention instead is simply a laboratory method facilitating study of cells on a substrate.
The '237 specification further characterizes the invention as a method to facilitate research by controlling the attachment or detachment of cells on substrates. '237 Patent col.4,11.1-15. Also, the specification points out that “[t]his invention finds application in the production of cell lines for research.” '287 Patent col.10 11.34-37 (emphasis added). In the discussion section, the '237 patent explains use of the inventive method to control cell attachment according to time, rate, location, or amount. '237 Patent col.9 11.53-54.
Thus, this method operates only as a tool for research, not a “patented compound” for FDA approval. The patented method is analogous to a patent on a microscope; the microscope’s sole use is as a tool for research. Clearly, a patent on an innovative microscope should not be rendered useless by the § 271(e)(1) exemption. Similarly, the '237 patent has only one use — as a research tool.
The '734 patent has only one claim:
1. A substantially purified cell surface receptor derived from mesenchymal tissue and capable of binding to a peptide containing the amino acid sequence Arg-Gly-Asp, comprising a glycoprotein composed of at least two polypeptides of about 115 and 125 kD, respectively, as determined by SDS-PAGE under reducing conditions which selectively binds to vi-tronectin, but not to fibronectin.
'73k Patent col.6 11.58-65. Similar to the '237 patent, the '734 patent covers a purified cell receptor. In the words of the patent, the '734 patent is “[a] method of isolating cell surface receptors utilizing a short peptide sequence bound to an affinity column.” '73k Patent Abstract. Purified cell receptors operate in a laboratory to determine compounds that will bind to it (and thus may be useful as drugs). Many pharmaceutical drugs work by binding to receptors on the surface of certain human cells. Therefore, a laboratory needs methods to study the binding process and to choose drug candidates. These purified cell receptors do not operate as “patented compounds” for FDA approval themselves, but rather as experimental targets to test for attachment characteristics. '73k Patent col.l 11.56-58. The regulation of cell growth and differentiation by selectively manipulating the research environment (i.e., cell types, cell functions) of the invention advances the state of the art of research in the laboratory environment. As such, this method of isolating cell surface receptors is only a tool to conduct research on biological and chemical systems.
The '234 and '734 patents claim only methods for use in laboratory settings. As research tools, these patents deserve protection. As such, I respectfully dissent with respect to the '237 and '734 patents and would remand back to the district court to determine what portion of the damages judgment applies to the use of these protected research tools.
This court also needs to properly analyze the claims of the other two patents in this case. First, the '525 patent is a genus covering a large number of compounds. Representative claim 8 of the '525 patent reads:
8. A substantially pure peptide including as the cell-attachment-promoting constituent the amino acid sequence Arg-Gly-Arg-R wherein R is Ser, Cys, Thr or other amino acid, said peptide having cell-attachmentpromoting activity, and said peptide not being a naturally occurring peptide.
*1352 '525 Patent col.8 11.50-55. As a patent covering a genus, the '525 patent is an invitation to find the beneficial species in a broad genus. A species within the broad genus of this patent could serve as a drug requiring FDA approval. The selection of a suitable species from a patented genus is apparently the situation which the Supreme Court placed within the § 271(e)(1) exemption. Thus, activities involving this patent could well fall within the exemption as defined by the Supreme Court. Indeed this court’s opinion makes that finding. That finding should have been made by a district court in proper fact finding procedures, rather than at the appellate level, but at least the '525 invention may support a finding of activities within the exemption.
The '997 patent “contemplates a new composition, a polypeptide which alters the cell attachment activity of cells to various substrates independent of its binding to collagen, affects cell phagocytosis, and which consists essentially of an isolated tetrapeptide X-Arg-Gly-Asp-Ser-Y wherein X is H or one or more amino acids and Y is OH or one or more amino acids.” '997 Patent col.2 11.21-27. This patent embraces a medical method with a compound having a RGD group. Although some fact-finding at the district court level would improve this court’s understanding of this invention, it could apparently have a reasonable relationship to FDA processes. Thus, while I concur with the majority with respect to the '525 and '997 patents, this court might more wisely remand these patents and this case to ascertain the proper application of the Supreme Court’s standards for the exemption.
Ill
A hypothetical example will help illustrate the importance of protecting research tool patent rights. Suppose a university professor or small independent research company invents and obtains a patent for a novel and extremely useful research tool. This invention represents the work of a lifetime for its inventors and perhaps most of the research budget for the university department or the small company — perhaps millions of dollars in investment. The only use of the invention tests other pharmaceutical compounds for effectiveness in fighting cancer. The invention does not itself fight cancer, but instead simply identifies the cancer fighting characteristics in other compounds. This patented invention would, of course, be of great use to the pharmaceutical industry. It would also benefit the public by identifying cancer treatments. The patent system of course would wish to protect this invention and give incentives for more investment in developing this kind of valuable research tool.
Sadly today’s opinion misreads the Supreme Court’s decision. This court reads the Supreme Court’s decision too broadly because it includes within the exemption the '237 and '734 patents, which are obviously research tools. This overbroad interpretation could obliterate all value for the hypothetical invention discussed above and with it the incentives for development of these inventions outside of the pharmaceutical industry itself. The pharmaceutical industry itself, of course, still needs these tools and will invest in their development, but outside that community, research tools will have no value. In other words, this opinion could shift all control of research and the patented tools that facilitate research to the insular pharmaceutical industry. Universities and independent researchers will have to understand that their work on research tools is likely to amount only to a charitable (but nondeductible) gift to the pharmaceutical industry.
The university professor or small company might expect a reward for the life *1353 time of labor and investment that produced the research tool. The inventor might also hope to use that reward to further his pioneer research. These benefits to the public and that inventor would flow from the patent’s right to exclude that would produce reasonable royalties. However, under today’s opinion, the exemption would swallow that lifetime of labor and investment because the nature of the use itself, without any concern for the object of the patented invention, would be the gauge upon which the exemption would be measured. See Majority Opinion, slip op. at 1341. In effect, any use of the hypothetical invention would automatically translate to non-infringement based on this court’s expansive application of 35 U.S.C. § 271(e)(1).
The Supreme Court in Merck did not expect such a broad result. Instead, as noted above, the Supreme Court specifically did not address “whether, or to what extent, § 271(e)(1) exempts from infringement the use of ‘research tools’ in the development of information for the regulatory process.” Merck KGaA, 545 U.S. at 205 n. 7, 125 S.Ct. 2372. Thus, upon remand, this court has the responsibility to analyze carefully the claims and apply the exemption to protect the selection of “patented compounds” even in the preclinical stage, while continuing to protect research tools. This court has the responsibility to protect FDA processes and research tool patents alike.
IV
Lastly, this court does not need to address these issues in a vacuum. Several noted opinions from other courts of international distinction show the value of protecting research tools while exempting some activities from infringement. These decisions from other national courts examine research tools in more detail and fashion proper protections for these inventions. In particular, these decisions protect research tool inventions when used for their intended purpose while allowing experimentation to improve the tool itself. Jonathan McPherson, The Impact of the Hatchr-Waxman Act’s Safe Harbor Provision on Biomedical Research Tools after Merck KGaA v. Integra Lifesciences I, Ltd., 10 Mich. St. J. Med. & Law 369, 382-383 (2006). For example, in Germany, the statutory research exemption for patents finds its origin in Article 31 of the Community Patent Convention.[1] To paraphrase the law and a seminal case interpreting this law, these tools obtain protection when used to conduct research as specified by the invention, but fall within an experimental exemption when studied to learn their method of operation or to improve their operation. See Klinische Versuche (Clinical Trials I), Federal Supreme Court of Germany, July 11, 1995, [1997] R.P.C. 623; Klinishe Versuche (Clinical Trials II), Federal Supreme Court of Germany, April 17, 1998, [1998] R.P.C. 423.
I concur in the result with respect to the '525 and '997 patents and respectfully dissent with respect to the '237 and '734 patents with a recommendation to remand to the district court for further analysis in view of the Supreme Court opinion.

. The Community Patent Convention influ-enees German patent law.