RADER, Chief Judge,
dissenting.
By definition, a patent defines a right to ' exclude. Consistent with property principles, an infringer of a valid patent is an unlawful trespasser. The remedy for tres *1362 passing, in this area of property law as well as others, is removal of the trespasser. Indeed even the Constitution acknowledges the patent owner’s right to exclude trespassers. U.S. Const, art. I, § 8, cl. 8. Thus, exceptions to the traditional property remedy amount to a get-out-of-jail-free card for the trespasser. Accordingly, such exceptions must occur only sparingly with awareness that this license allows the wrongdoer free reign to continue trespassing.
The public readily applauds the role of patents in the development and delivery to the marketplace of life-saving drugs or modern technology products like smart-phones. At the same time, many incremental advances contribute to these monumental advances or, as in this case, enhance their delivery to the public. These incremental inventions also represent difficult and expensive advances in technology. For example, in this case, Amphastar had a strong incentive to invent this patented manufacturing method. As the first-filer, it would have obtained 180 days of market exclusivity as the only seller of the generic drug — a right worth $260 million per quarter. Nevertheless, Amphastar could not make that invention. Instead, the patentee Momenta made the investment, did the research, and engineered the new method disclosed in the '886 patent.
At that point, Amphastar stepped in and took Momenta’s patented invention without permission and used it to manufacture each commercial batch it sells on the market. Indeed Amphastar continues to trespass and promises to trespass for years to come. In fact, as the court repeatedly acknowledges, Amphastar is only able to compete with Momenta by taking its pat-' ented invention. Amphastar has not developed its own method, but instead delights in trespassing and refuses to pay a reasonable royalty to make the trespass lawful.
This court would allow this arrogance to continue by expanding the limited reach of 35 U.S.C. § 271(e)(1). This expansion of the law circumvents the purpose of the law and ignores the binding precedent of Classen Immunotherapies, Inc. v. Biogen IDEC, 659 F.3d 1057 (Fed.Cir.2011). Sadly this result will render worthless manufacturing test method patents. Accordingly, I must respectfully dissent.
I.
The Supreme Court has observed that the text alone of § 271(e)(1) can be “not plainly comprehensible.” Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 669, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990). The purpose of this text, which ought to inform its application, however, is evident from the legislative history. The legislative history of § 271(e)(1) includes more than 2 House reports, 25 statements and letters, and many pages of Congressional testimony. A review of this extensive material shows that section 202 of the Hatch-Wax-man Act, enacted as § 271(e)(1), had the sole purpose of overruling this court’s holding in Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858 (Fed. Cir.1984). In particular, § 271(e)(1) applied only in limited situations, namely pre-approval experiments to obtain FDA approval:
The purpose of 271(e)(1) and (2) is to establish that experimentation with a patented drug product, when the purpose is to prepare for commercial activity which will begin after a valid patent expires, is not a patent infringement. Since the Committee’s Subcommittee on *1363 Health and the Environment began consideration of this bill, the Court of Appeals for the Federal Circuit held that this type of experimentation is infringement. In Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858 (Fed. Cir.1984), the Court of Appeals for the Federal Circuit held that the experimental use of a drug product prior to the expiration date of a patent claiming that drug product constitutes patent infringement, even though the only purpose of the experiments is to seek FDA approval for the commercial sale of the drug after the patent expires. It is the Committee’s view that experimental activity does not have any adverse economic impact on the patent owner’s exclusivity during the life of a patent, but prevention of such activity would extend the patent owner’s commercial exclusivity beyond the patent expiration date.
H.R.Rep. No. 98-857, pt. 1, at 45-46 (1984), 1984 U.S.C.C.A.N. 2647, 2678-2679 (emphases added).
The provisions of section 202 of the bill have the net effect of reversing the holding of the court in Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858 (Fed.Cir.1984).
H.R.Rep. No. 98-857, pt. 2, at 27 (1984), 1984 U.S.C.C.A.N. 2686 at 2711. See also Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Sub-comm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 742 (1984) (statement of Laurence H. Tribe, Professor of Law, Harvard Law School) (“Section 202, the thrust of which is to overturn Roche v. Bolar legislatively”); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm. on the Judiciary, 98th Cong. 826 (1984) (letter from Bernarr R. Pravel, President, American Intellectual Property Law Association) (“Section 202 is intended to reverse the April 23, 1984, decision of the Court of Appeals for the Federal Circuit in Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858 (Fed.Cir. 1984).”); Memorandum from Congressional Research Service, The Library of Congress, American Law Division to House Judiciary Committee, located at H.R.Rep. No. 98-857, pt. 2, at 27 n.18 (1984), 1984 U.S.C.C.A.N. 2686 at 2711.
Roche v. Bolar held that the limited preapproval experiments to obtain FDA approval still infringed a valid patent. See 733 F.2d at 861 (“The district court correctly recognized that the issue in this case is narrow: does the limited use of a patented drug for testing and investigation strictly related to FDA drug approval requirements during the last 6 months of the term of the patent constitute a use which, unless licensed, the patent statute makes actionable?” (emphasis added)). In overturning Roche v. Bolar, § 271(e)(1) allowed pharmaceutical companies to conduct such experiments to obtain FDA approval. The new section enabled those companies to begin the approval process while the patent is still in force, so that they can obtain FDA approval and begin selling immediately after the patent’s life. Otherwise, the safety testing processes would have to wait until after the patent’s life ends thus creating a lag in time when the patent would not be in force yet the companies could not enter the market pending FDA approval:
In order to complete this application the generic manufacturer must conduct certain drug tests. In order to *1364 facilitate this type of testing, section 202 of the bill creates general exception to the rules of patent infringement. Thus, a generic manufacturer may obtain a supply of a patented drug product during the life of the patent and conduct tests using that product if the purpose of those tests is to submit an application to FDA for approval.
130 Cong. Rec. 23060 (1984) (statement of Rep. Robert W. Kastenmeier, Chairman of the Subcommittee on Courts, Civil Liberties and the Administration of Justice, Committee on the Judiciary) (emphases added).
The Pharmaceutical Manufacturers Association echoed the Chairman’s analysis of the purpose of the bill:
The sponsors and supporters of the legislation have agreed from the beginning that generic products should not be approved for marketing prior to the expiration of a valid patent as extended under the legislation. In return, there has been a compromise agreement that preapproval testing could be conducted prior to the expiration of the patent, as extended, so that marketing could begin immediately thereafter. Therefore, the bill reverses the Roche v. Bolar decision to permit a generic company to “use” a patented product for the limited purpose of completing the testing necessary for FDA approval.
Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 696 (1984) (letter from Pharmaceutical Manufacturers Association) (emphases added).
On the other side of the industry, the Generic Pharmaceutical Industry Association agreed that section 202 is only for limited pre-approval experiments:
The purpose of the foregoing provision is to permit a generic drug manufacturer to engage in the limited experimental activities which are necessary to obtain FDA pre-marketing approval before a patent expires so that actual competition between the generic drug and the original drug can begin immediately after the patent covering the original drug expires. Section 202 does not authorize any activity which would deprive the patent owner of the sale of a single tablet during the life of a valid patent. In fact, the limited testing activity required to obtain FDA approval of a generic drug would not normally result in the use of even a single generic tablet for its therapeutic purpose during the life of a valid patent.
Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 926 (1984) (memorandum of Alfred B. Engleberg, Patent Counsel, Generic Pharmaceutical Industry Association) (emphases added).
The executive branch favored an even more limited exception than the one proposed in section 202 and enacted as § 271(e)(1). Nevertheless, it clearly understood the boundaries of section 202 to be pre-approval experimental use.
This letter sets forth the Administration’s views on H.R. 3605 ... First, section 202 of title II should be amended to permit experimental use of a drug by a non-patentee only during the period in which the affected patent is in restoration period. Existing patentees have relied upon accepted doctrine indicating *1365 that use of a patented invention for the purpose of obtaining regulatory approval infringes that patent. Upsetting expectations of this sort could only inhibit future innovation and investment, which depend upon the integrity of the patent laws.
Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Sub-comm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm. on the Judiciary, 98th Cong. 812 (1984) (letter from David A. Stockman, Director, Office of Management and Budget, to Rep. Edward R. Madigan, Subcomm. on Health and the Environment, H. Comm, on Energy and Commerce) (emphasis added).
The pharmaceutical industry expressed concern about permitting trespass on exclusive rights, but this concern dissipated with promises that § 271(e)(1) only allowed “limited testing of drugs.” See H.R.Rep. No. 98-857, pt. 2, at 29 (1984), 1984 U.S.C.C.A.N. 2686 at 2714.
In this ease the generic manufacturer is not permitted to market the patented drug during the life of the patent; all that the generic can do is test the drug for purposes of submitting data to the FDA for approval. Thus, the nature of the interference is de minimis.
Id. at 30 (emphases added).
Specifically, § 271(e)(1) won approval because it was limited in time, quantity, and type. First, as to time, § 271(e)(1) only applies to pre-marketing approval. 130 Cong. Rec. 23060 (1984) (statement of Rep. Robert W. Kastenmeier, Chairman of the Subcommittee on Courts, Civil Liberties and the Administration of Justice, Committee on the Judiciary) (see block quote above); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm, on the Judiciary, 98th Cong. 696 (1984) (letter from Pharmaceutical Manufacturers Association) (see block quote above); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm, on the Judiciary, 98th Cong. 742 (1984) (statement of Laurence H. Tribe, Professor of Law, Harvard Law School) (“Section 202, the thrust of which is to overturn Roche v. Bolar legislatively, so as to provide that it is not an infringement to make, use, or sell a patented invention for purposes ‘reasonably related’ to the development and submission of information to obtain FDA’s premarketing approval to engage in the commercial manufacture, use, or sale of the drug after patent expiration”) (emphasis added); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm, on the Judiciary, 98th Cong. 926 (1984) (memorandum of Alfred B. Engleberg, Patent Counsel, Generic Pharmaceutical Industry Association) (see block quote above); Memorandum from Congressional Research Service, The Library of Congress, American Law Division to House Judiciary Committee, located at H.R.Rep. No. 98-857, pt. 2, at 27 n.18 (1984), 1984 U.S.C.C.A.N. 2686, 2711 n. 18 (“In § 202, Congress would provide that it is not an infringement to make, use, or sell a patented invention solely for uses reasonably related to the development and submission of information for the purpose of obtaining FDA premarketing approval of a drug.”).
Second, as to quantity and type, § 271(e)(1) only applies to experimentation — and therefore would have limited impact on the patentee’s exclusivity during *1366 the life of the patent. H.R.Rep. No. 98-857, pt. 1, at 45-46 (1984), 1984 U.S.C.C.A.N. 2647 at 2678-2679 (see block quote above); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm, on the Judiciary, 98th Cong. 696 (1984) (letter from Pharmaceutical Manufacturers Association) (see block quote above); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 742 (1984) (statement of Laurence H. Tribe, Professor of Law, Harvard Law School) (quoted above); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 926 (1984) (memorandum of Alfred B. Engleberg, Patent Counsel, Generic Pharmaceutical Industry Association) (see block quote above).
In particular, the authors made clear that section 271(e)(1) would not apply to commercial sales, i.e., the “infringing” product would not enter the market until after the patent’s life. H.R.Rep. No. 98-857, pt. 1, at 45 (1984), 1984 U.S.C.C.A.N. 2647 at 2678 (“This section does not permit the commercial sale of a patented drug by the party using the drug to develop such information, but it does permit the commercial sale of research quantities of active ingredients to such party.”) (emphasis added); Innovation and Patent Law Reform: Hearing on H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary, 98th Cong. 932 (1984) (memorandum of Alfred B. Engleberg, Patent Counsel, Generic Pharmaceutical Industry Association) (“The limited ‘experimental use’ permitted by Section 202 does not, in any way, impinge on the exclusive right of the patent owner to make, use and sell the patented invention for all commercial purposes during the life of the patent. The permitted experimental use would not result in competitive commercial activity until all valid patents expired.”) (emphases added).
The authors of this section (and I hesitate to add that I was present through this legislative process) did not imagine that § 271(e)(1) would allow continuous, commercial infringing sales during any portion of the life of the patent. As discussed below, Amphastar has already obtained FDA regulatory approval, and today this court rewrites the law to allow Amphastar to infringe Momenta’s patent throughout the entire life of Momenta’s patent and for the purpose of obtaining profits on coromercial sales of a product that competes with the patentee.
Nowhere in the legislative history can this court find any suggestion that § 271(e)(1) would apply other than in the limited scenario of conducting de minimis experiments pre-approval (ie., to obtain FDA approval). Nowhere in the legislative history can this court find a hint that an “infringer” could continue to use its competitor’s patented method in manufacture of each commercial batch for contemporaneous sale. Nowhere in the legislative history can this court find any mention of the post-approval, continuous, commercial sales allowed by this decision. Nowhere in the legislative history can this court find any suggestion that the mere maintenance or retention of information as part of a company’s records is considered a submission that would trigger § 271(e)(1). In fact, this court makes no attempt to examine the legislative history of this section at all — -a very telling silence.
*1367 Of course, this court proclaims that it finds no ambiguity requiring it to find out the purpose of the section it distorts. To the contrary, the Supreme Court found the statute can be ambiguous and “not plainly comprehensible.” See Eli Lilly, 496 U.S. at 669, 110 S.Ct. 2683. Moreover the court strains to avoid ambiguity by discounting critical statutory phrases, namely “solely” and “submission.”
To facilitate a post-approval, continuous, commercial use, the court discounts the word “solely.” Indeed, throughout its opinion, the court cites the language of the statute yet omits the word “solely.” See Majority Op. 1355, 1355-56, 1356, 1356-57, 1359, 1359-60. If one properly reads “solely” as the statute says, the result must be that Amphastar’s activity is not within the statute. Its infringing activity is not solely for developing and submitting information to the FDA. Instead, Amphastar uses this method for the purpose of manufacturing a product to sell on the market in commerce.
Second, the court claims that the mere retention of records can satisfy the “submission” requirement in § 271(e)(1). By essentially stating that “submission” can mean not really submitting, this new interpretation reads this requirement out of the statute as well.
Specifically, despite the plain meaning of “submission of information” to mean the company actually submitting information to the FDA, the court interprets “submission of information” to mean the mere retention of information as part of a company’s records. Majority Op. 1357 (“We think that the requirement to maintain records for FDA inspection satisfies the requirement that the uses be reasonably related to the development and submission of information to the FDA. Thus, we consider this information ‘submitted’ for purposes of the statute.” (emphasis added)), 1358. Maintaining or keeping a document has the exact opposite meaning of submitting a document. In other words, “submission” means not really submitting anything — a strange construction of an “unambiguous” term.
This new interpretation would allow almost all activity by pharmaceutical companies to constitute “submission” and therefore justify a free license to trespass. The FDA can inspect records of any drug manufacturer and seller. See 21 U.S.C. § 374. Thus, the drug manufacturer need only make a record, which could potentially be inspected by the FDA, and then any activity could satisfy this new meaning of “submission.”
Therefore, a reading of all the words in the statute and a reading of those words in light of their legislative history shows that § 271(e)(1) only permits a limited amount of pre-approval experiments to obtain FDA approval. Thus, the statute limits the exception to “solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.”
II.
This court has already decided the meaning of this statute in Classen. The Classen majority held “§ 271(e)(1) provides an exception to the law of infringement in order to expedite development of information for regulatory approval of generic counterparts of patented products. The statute does not apply to information that may be routinely reported to the FDA, long after marketing approval has been obtained.” 659 F.3d at 1070 (empha *1368 sis added). As support, Classen looked to the legislative history: “The Report is replete with statements that the legislation concerns premarketing approval of generic drugs. The Report emphasizes that ‘The information which can be developed under this provision is the type which is required to obtain approval of the drug.’ ” Id. at 1071 (emphases added).
Classen also looked to Supreme Court precedent, such as Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) and Merck KGaA v. Integra Lifesciences I, Ltd., 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005): “Every decision examining the statute has appreciated that § 271(e)(1) is directed to premarketing approval of generic counterparts before patent expiration.” Id. at 1071 (emphasis added). In particular, Classen stated:
Our colleague in dissent strays from statute and precedent, in arguing that any activity by any entity concerning any adversely patented product or method is exempted from infringement by § 271(e)(1), provided only that the information obtained is ‘reasonably related to submitting any information under the FDCA,’ [659 F.3d at 1083 (Moore, J., dissenting) ] (emphasis in dissent), ‘including information regarding post-approval uses.’ Id. Such a massive enlargement of the statutory exemption is incorrect.
Id. at 1072 n. 4 (bold emphasis added).
Here, Amphastar uses Momenta’s patented method in the manufacture of each commercial batch it sells. By definition, its use is not to obtain FDA approval. One can only market a drug that the FDA has already approved. Amphastar is not using Momenta’s patented method for preapproval, limited experimental use. It is not pre-approval because Amphastar has already obtained approval. See Appellant Br. 7 (Amphastar received FDA approval on September 19, 2011.); Majority Op. 1359 (“It also avoids the situation here, where a drug has received approval ... ”). Thus, its activity is post-approval. It is not limited because Amphastar uses Momenta’s invention on a continuous basis in the manufacture of each commercial batch and during the life of Momenta’s patent. It is not experimental because Amphastar uses Momenta’s invention in manufacturing each commercial batch of its product for contemporaneous sale on the market (in commerce) to obtain profits and to compete with Momenta. This is a commercial use of an invention by a competitor to compete and trespass on the inventor’s exclusive right. Amphastar’s use is not for premarketing FDA approval and therefore Classen definitively holds that § 271(e)(1) does not apply here.
To come out the exact opposite way, the court first claims Classen did not turn on the pre-/post-approval distinction. Majority Op. 1358. Second, the court claims Classen merely held that § 271(e)(1) does not apply to “routine” submissions. Therefore, this court opines: “This case, however, fits well within Classen because the information submitted is necessary both to the continued approval of the ANDA and to the ability to market the generic drug. Here, the submissions are not ‘routine submissions’ to the FDA, but instead are submissions that are required to maintain FDA approval.” Majority Op. 1358.
At the outset, this court must stretch too far to claim Classen did not turn on a pre/post-approval distinction. The dissent actually helps identify the holding in Clas *1369 sen. The Classen dissent stated: “The majority concludes that the district court incorrectly interpreted the safe harbor of § 271(e)(1) because, according to the majority, § 271(e)(1) is limited to pre-approval activities. ... Accordingly, I conclude that the safe harbor extends to all uses that are reasonably related to submitting any information under the FDCA, including information regarding post-approval uses.... ” 659 F.3d at 1083 (emphases added).
Further, the parties and the amici certainly thought Classen turned on a pre/post-approval distinction. See, e.g., Classen’s Opposition to Petition for Rehearing En Banc, at *1 (“Plaintiff-Appellant agrees with Hatch-Waxman, The United States Supreme Court and the Federal Circuit: 35 U.S.C. § 271(e)(1) applies only to pre-market development activities, there is no safe harbor after the commencement of commercial sales of a drug. An extension of 271(e)(1) into the post-approval/post-commercialization period is outside the scope of the Drug Price Competition and Patent Term Restoration Act and would present unworkable difficulties in its application.”) (emphases added).
Moreover, this court in Classen did not at any point state that § 271(e)(1) applies to information “necessary both to the continued approval of the ANDA and to the ability to market the generic drug.” Majority Op. 1358. Indeed, this post-approval, continuous, commercial use is the exact opposite of the Classen rule. Classen rested its holding on “premarketing approval,” 659 F.3d at 1070, 1071, “limited amount of testing,” id. at 1071, and “experimentation,” id.
This decision (“post-approval studies”; “after approval”; “not restricted to preapproval activities”) cannot be genuinely reconciled with Classen (“pre-marketing approval”). Instead, the court in this decision uses the same language as the dissent in Classen (“post-approval”; “I conclude that the safe harbor extends to all uses that are reasonably related to submitting any information under the FDCA, including information regarding post-approval uses”). This decision should instead request the entire court to resolve the issue en banc.
The court distinguishes Classen by characterizing the activities in that case as not “mandated by the FDA,” while the activities here are. Some context is in order. The patented method here is “mandated” only in that Momenta thus far has created and developed the only successful method by which one can show the FDA’s requirement has been met. Amphastar is free to invent its own method to satisfy these requirements. Instead it chooses to trespass. Because it has not ventured to find another way to perform these tests, it is unfair to suggest that Amphastar’s hands are tied. Indeed, to the extent the court is creating a new expansion of the statute that covers anything “mandated” by the FDA, this would unfairly attack inventors of the newest and most successful method. Such a method would be adopted or “mandated” by the FDA and then trigger the court’s new infringement exception. Needless to say, that would be the exact opposite from a system that incentivizes creation and improvement.
III.
This court’s interpretation of § 271(e)(1) would essentially render manufacturing method patents worthless. This court repeatedly states that the FDA’s adoption of Momenta’s patented method as a standard means that § 271(e)(1) should apply. Ma *1370 jority Op. 1358 (“the information here is not generated voluntarily by the manufacturer but is generated by FDA requirements the manufacturer is obligated under penalty of law to follow”), 1359 (“that act of infringement is, in effect, required by the federal government as part of the continuing safety and efficacy monitoring of an approved drug”), id. (“where a drug has received approval, but is nevertheless kept from the market based on an FDA mandated testing requirement”), 1359 (“the fact that Amphastar’s testing is carried out to ‘satisfy the FDA’s requirements’ means it falls within the scope of the safe harbor, even though the activity is carried out after approval”), 1360 (“Amphastar’s allegedly infringing activities are clearly carried out according to the dictates of the Federal Food, Drug, and Cosmetic Act”).
In essence, this reasoning repeals the incentives and protections of the patent act in this area. A patentee invents the first and (at the time) best method. Because of the success and utility of the inventive method, the FDA adopts that method as a standard. Because that method is “required by the FDA,” this court would permit copiers to infringe. What incentive remains to invest in inventing a better test? Imagine a teacher who rewards the top student by allowing her peers to copy her exam answers. Needless to say, this approach does violence to patent law and future research incentives in this field.
And what happens if a second, less effective (patented) method appears? Will copiers be allowed to infringe that method, too? Or, instead, because it is not as good and the FDA does not adopt it as the standard, then the court’s new interpretation of § 271(e)(1) does not apply and copiers can infringe the first, best method but not the second, less effective method?
IV.
The Supreme Court cases Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) and Merck KGaA v. Integra Lifesciences I, Ltd., 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005) support the holding in Classen and do not support this decision. Both holdings in Eli Lilly and Merck dealt with pre-approval activity and submissions, meaning before obtaining FDA approval. Further, neither even suggested that the mere maintenance or retention of information as part of a company’s records could be a “submission” to the FDA. Nevertheless, the court takes phrases from those opinions out of context to allege that its new interpretation of § 271(e)(1) is consistent with those cases.
In Eli Lilly, the Supreme Court addressed whether § 271(e)(1) applies to medical devices in addition to drugs. 496 U.S. at 663-64, 110 S.Ct. 2683 (“This case presents the question whether 35 U.S.C. § 271(e)(1) renders activities that would otherwise constitute patent infringement noninfringing if they are undertaken for the purpose of developing and submitting to the Food and Drug Administration (FDA) information necessary to obtain marketing approval for a medical device under § 515 of the Federal Food, Drug, and Cosmetic Act (FDCA), 90 Stat. 552, 21 U.S.C. § 360e.”).
The Supreme Court described how §§ 201 and 202 should be read together. Section 201 concerns activity in the early years of a patent’s life. Section 202 concerns the latter years. Each section is a reciprocal counter to the other. Importantly, Congress intended the sections to deal with “premarket regulatory approval”:
The parties agree that the 1984 Act was designed to respond to two unintended *1371 distortions of the 17-year patent term produced by the requirement that certain products must receive premarket regulatory approval. First, the holder of a patent relating to such products would as a practical matter not be able to reap any financial rewards during the early years of the term.... Thus, if the discovery relates to a product that cannot be marketed without substantial testing and regulatory approval, the “clock” on his patent term will be running even though he is not yet able to derive any profit from the invention. The second distortion occurred at the other end of the patent term. In 1984, the Court of Appeals for the Federal Circuit decided that the manufacture, use, or sale of a patented invention during the term of the patent constituted an act of infringement, see § 271(a), even if it was for the sole purpose of conducting tests and developing information necessary to apply for regulatory approval. See Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858 (Fed.Cir. 1984). Since that activity could not be commenced by those who planned to compete with the patentee until expiration of the entire patent term, the patentee’s de facto monopoly would continue for an often substantial period until regulatory approval was obtained. In other words, the combined effect of the patent law and the premarket regulatory approval requirement was to create an effective extension of the patent term.
496 U.S. at 669-670, 110 S.Ct. 2683 (emphases added). Therefore:
“The 1984 Act sought to eliminate this distortion from both ends of the patent period. Section 201 of the Act established a patent-term extension for patents relating to certain products that were subject to lengthy regulatory delays and could not be marketed prior to regulatory approval.... Section 201 provides that patents relating to these products can be extended up to five years ... The distortion at the other end of the patent period was addressed by § 202 of the Act.... This allows competitors, prior to the expiration of a patent, to engage in otherwise infringing activities necessary to obtain regulatory approval.”
Id. at 670-71, 110 S.Ct. 2683 (emphasis added).
The 1984 Act enacted the two sections to create a balance. The Supreme Court rejected the party’s attempt to create a “disequilibrium” between the two sections. Id. at 672,110 S.Ct. 2683.
This court’s new interpretation in this case would apply the disadvantage of § 202 to a patentee who would not be able to obtain the benefits of § 201. The patentee of a manufacturing patent does not obtain the patent extension created in § 201, yet this court’s new expansion of § 202 would allow its competitors to infringe during the life of its patent. The Supreme Court rejected this sort of disequilibrium. See Proveris Scientific Corp. v. Innovasystems, Inc., 536 F.3d 1256 (Fed.Cir.2008) (relying on Merck to hold that § 271(e)(1) does not apply to infringement of patented product not eligible to obtain patent extension).
This court’s new interpretation does not reserve § 202 for the “end of the patent term.” Instead, its interpretation allows infringing activity continuously throughout the life of the patent, including the “early years” reserved for § 201. If, as the court claims, § 202 was meant to cover the continuous, commercial use throughout the *1372 life of the patent, there would be no balance between § 201 and § 202. This decision improperly cuts short the life of Momenta’s patent.
And, as already discussed, this new interpretation expands beyond “premarket regulatory approval.” See 496 U.S. at 669-670, 110 S.Ct. 2683. Its interpretation allows infringing activity after the product has already been approved for sale on the market.
Surprisingly, the court claims that its “analysis is not groundbreaking: the Supreme Court came to essentially the same conclusion in 1990” and cites Eli Lilly. Majority Op. 1355-56. It has been quoted that “Words are easy, like the wind.” Saying that something “is not groundbreaking” does not make it so.
Nowhere in Eli Lilly does the Supreme Court come to “essentially the same conclusion” as the majority here. The Supreme Court does not say that the mere maintenance or retention of records — with no intention to submit to the FDA but that only could potentially be viewed by the FDA if the FDA requested it — would satisfy as a “submission” to the FDA. The Supreme Court does not sanction post-approval activity. The Supreme Court does not read the word “solely” out from the statute.
It is more telling what the court’s reasoning omits than what it cites. The court only relies on a single sentence from Eli Lilly, which it quotes out of context. 496 U.S. at 666, 110 S.Ct. 2683 (“But the phrase ‘a Federal law which regulates the manufacture, use, or sale of drugs’ more naturally summons up the image of an entire statutory scheme of regulation.”). The Supreme Court was not even referencing the same phrase that is at issue here: “a Federal law,” not “submission.” In fact, that sentence is not even in the section in the Supreme Court’s opinion that discusses the basis on which the Court decided the case. Instead, that sentence is in a prior section discussing the text of the statute, which the Supreme Court found “somewhat more naturally reads as the Court of Appeals determined, but that is not plainly comprehensible on anyone’s view.” Id.
The sentence cited by this court is not even a definitive holding of the Supreme Court but instead a discussion of the parties’ arguments. In looking at the paragraphs following the one cited by this decision, the Supreme Court states the case for the opposing side: “On the other side of the ledger, however, one must admit that while the provision more naturally means what respondent suggests, it is somewhat difficult to understand why anyone would want it to mean that. Why should the touchstone of noninfringement be whether the use is related to the development and submission of information under a provision that happens to be included within an Act that, in any of its provisions, not necessarily the one at issue, regulates drugs?” Id. at 668, 110 S.Ct. 2683. On other occasions, the Federal Circuit advises against this type of slanted wordsmithing.
In Merck, the Supreme Court addressed whether § 271(e)(1) applies to research intended for submission for FDA approval but ultimately not submitted to the FDA. 545 U.S. at 195, 125 S.Ct. 2372 (“This case presents the question whether uses of patented inventions in preclinical research, the results of which are not ultimately included in a submission to the Food and Drug Administration (FDA), are exempted from infringement by 35 U.S.C. *1373 § 271(e)(1).”). In other words, the case presented an instance of limited experiments performed in the pre-approval stage of drug development.
Nowhere does Merck suggest that post-approval, commercial, continuous infringing use would be permitted. Indeed, Merck clearly lays out that § 271(e)(1) is intended for pre-approval, experimental, limited use.
“Basic scientific research on a particular compound, performed without the intent to develop a particular drug or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce, is surely not ‘reasonably related to the development and submission of information’ to the FDA. It does not follow from this, however, that § 271(e)(l)’s exemption from infringement categorically excludes either (1) experimentation on drugs that are not ultimately the subject of an FDA submission or (2) use of patented compounds in experiments that are not ultimately submitted to the FDA. Under certain conditions, we think the exemption is sufficiently broad to protect the use of patented compounds in both situations.” [545 U.S. at 205-06, 125 S.Ct. 2372 (emphasis added) ] “Moreover, many of the uncertainties that exist with respect to the selection of a specific drug exist as well with respect to the decision of what research to include in an IND or NDA. As a District Court has observed, ‘[I]t will not always be clear to parties setting out to seek FDA approval for their new product exactly which kinds of information, and in what quantities, it will take to win that agency’s approval.’ Intermedies, Inc. v. Ventritex, Inc., 775 F.Supp. 1269, 1280 (N.D.Cal.1991), aff'd, 991 F.2d 808 (Fed. Cir.1993). This is especially true at the preclinical stage of drug approval.”
545 U.S. at 207, 125 S.Ct. 2372 (emphases added).
This court relies on some text from Merck that appears superficially to suggest an expansive interpretation of § 271(e)(1). But, read in context, that language has another meaning entirely. This language appears to suggest that § 271(e)(1) covers any sort of information or submission. But, this language actually appears in the context of the issue in Merck of whether information intended for submission to the FDA for approval should be covered when the information was ultimately not submitted because the drug candidate in that case lacked potential. This context is apparent in the sentences next to the sentence quoted by the majority, which state:
We decline to read the “reasonable relation” requirement so narrowly as to render § 271(e)(i )’s stated protection of activities leading to FDA approval for all drugs illusory. Properly construed, § 271(e)(1) leaves adequate space for experimentation and failure on the road to regulatory approval: At least where a drug-maker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the FDA, that use is “reasonably related” to the “development and submission of information under ... Federal law.” § 271(e)(1).
Id. at 207, 125 S.Ct. 2372 (emphases added).
Merck does not reduce the importance of the limitation that § 271(e)(1) is re *1374 served “solely for uses reasonably related to the development and submission of information.” Holding that preclinical research reasonably expected to generate information for regulatory approval does not fall outside § 271(e)(1) simply because the research fails and does not result in a regulatory application, id. at 206-07, 125 S.Ct. 2372, is a far cry from permitting infringement during manufacture of a commercial product merely because the infringing act also generates information that might someday be submitted to the FDA, long after marketing approval is granted. Here, Amphastar’s use of the patented method is primarily for production of a commercial product; it is not “solely for uses reasonably related to” development of information.
As another point, this court claims that “the Court explicitly rejected the notion that § 271(e)(1) was limited ‘to the activities necessary to seek approval of a generic drug.’” Majority Op. 1356. But, it is important to understand what Merck was trying to distinguish. Read in context, that phrase is referring to allowing § 271(e)(1) to include pre-approval activities for a branded drug. It was not stating that § 271(e)(1) included post-approval activities for a generic drug. In other words, the Supreme Court was emphasizing the words “generic drug,” not the words “necessary to seek approval.” Imagine ordering a computer and stating that “I do not want it delivered to my house on Wednesday.” Then, the post office delivered it to your neighbor’s house on Thursday. Obviously, you meant to emphasize “Wednesday,” not “my house.” Similarly, this court must read the Supreme Court’s cases as a whole and in context.
Just because Merck held that § 271(e)(1) could cover pre-approval activities for not only the ANDA but also the NDA and IND, does not mean that the mere retention of documents as part of a company’s records could be considered a “submission” to the FDA. In other words, if a house owner allows a hired painter to paint his house any and all shades of brown, that is not permission to choose neon orange or turquoise.
Thus, while Merck said that as long as an activity was intended for submission to obtain approval, then § 271(e)(1) applies even if the information is not actually submitted (because it is difficult to predict which drug candidates ultimately will be successful), it did not say that § 271(e)(1) applies even if the activity was never intended to obtain approval at all. Or if the information was not even intended for submission to the FDA. This court’s interpretation (that the mere retention of information as part of a company’s records can be a “submission” to the FDA) is indeed “groundbreaking” and the Supreme Court did not “come to essentially the same conclusion.”
V.
The safe harbor provision at issue in this case, due to its origin and purpose in reversing Roche v. Bolar, receives attention as an exception that permits experimentation. This link to experimentation and its role in advancing the progress of technology requires some commentary as well. Too often patent law is misunderstood as impeding more than promoting innovation. This academic proposition, called the tragedy of the Anti-commons in some scholarly presentations, suggests that exclusive rights impede the flow of information and limit experimentation that might lead to the next generation of technological advance. Michael A. Heller & Rebecca S. *1375 Eisenberg, Can Patents Deter Innovation.? The Anticommons in Biomedical Research, 280 Science 698 (1998).
In the first place, in an era of empirical research, one might ask the reason that this academic notion has never actually-been verified. Although studied, no research has substantiated this alleged attack on the patent system. In fact, “the effects predicted by the anti-commons hypothesis are not borne out in the available data.” Timothy Caulfield, Human Gene Patents: Proof of Problems?, 84 Chi.-Kent L.Rev. 133, 137 (2009); see also American Association for the Advancement of Science, International Intellectual Property Experiences: A Report op Four Countries 12 (2007) (finding the results of a 2006 survey of U.S. and Japanese researchers “offer very little evidence of an ‘anticommons problem’ ” and that “IP-protected technologies remain relatively accessible to the broad scientific community”). Surveys of academic researchers have revealed that “only 1 percent ... report having to delay a project, and none abandoned a project due to others’ patents.” Wesley M. Cohen & John P. Walsh, Real Impediments to Academic Biomedical Re search, in 8 Innovation Policy and the Economy 1,10-11 (Adam B. Jaffe, Josh Lerner, & Scott Stern eds. 2008), available at http://www.nber. org/marschke/mice/Papers/cohenwalsh.pdf (citing John P. Walsh et al., The View from the Bench: Patents, Material Transfers and Biomedical Research, 309 Science 2002 (2005)). In other words, patents on research tools and biomedical innovations do not significantly slow the pace of research and do not deter researchers from pursuing promising projects.
The reason that patents have not been proven to impede more than stimulate technological advance is simple: it does not happen. It does not happen for several reasons. First, experiments advancing technology rarely, if ever, generate commercial value. Thus patent owners have little, if any, incentive to license or inhibit research. Stated otherwise, even if a patent owner wanted to sue or license potential researchers, experiments do not produce income or a source of damages. See id. at 12.
Second, in the modern age of technology, the character of technological advance has changed. The era when the Bell Labs or some other tech center could hire the most promising engineers and essentially invent everything for the world has passed. With the vast specialization of all fields of research, advances in technology require great cooperation. A new product or a new direction in biotechnology or electronics will be produced by cooperation between a professor in Chengdu, China, a young programmer in Bangaluru, India, an engineer at a large corporation in Munich, Germany, a graduate student at Tokyo University, and a team at a small start-up company in Silicon Valley. The patent system can help inform each of them of the other and bring together their incremental advances to achieve the next generation of progress in some tiny corner of human progress.
Thus, patents properly remain a tool for research and experimentation because the system encourages publication and sharing of research results. Disclosure of how to make and use the invention is the “quid pro quo” of the patent grant. See JEM Ag Supply, Inc. v. Pioneer Hi-Bred Int’l, Inc., 534 U.S. 124, 142, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001). In exchange for disclosure, the inventor receives a limited term of exclusivity to benefit from com *1376 mercialization of his invention. Without this promise of exclusivity, researchers at corporations would be forced to turn to secrecy as the best protection for their inventions. Even academic researchers may delay publication of results in order to maintain an edge over the competition, Cohen & Walsh, supra at 14, and the race to the patent office helps counteract this tendency toward secrecy by rewarding earlier disclosure. “The information in patents is added to the store of knowledge with the publication/issuance of the patent. ... [It] is not insulated from analysis, study, and experimentation for the twenty years until patent expiration.” Classen, 659 F.3d at 1072. Rather, information shared through patent applications is immediately available for others to build upon. It speeds the progress of scientific endeavor. In other words, the patent system’s modern benefits facilitate experimentation far more than any hypothetical inhibition.
VI.
Every day, Amphastar, a competitor of Momenta, is infringing Momenta’s patent. This decision allows that trespass. Moreover, to reach that result, this court must ignore its own prior decision in Classen and the purpose of the statute explained in the legislative history. Sadly this decision abrogates Momenta’s hard-achieved property right and reallocates that entitlement to its competitors — a sad day for property owners and an undeserved victory for those who decline to invest in the expense and difficulty of discovery and invention.